**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **CYNTHIA ESTELLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **1:20-cv-02543** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BLUESTEM BRANDS, INC., d/b/a FINGERHUT,** | ) | |
| **LENDINGCLUB CORPORATION, and** | ) | |
| **WEBBANK,** | ) | |
| **Defendants.** | ) | |

## COMPLAINT

NOW COMES the plaintiff, CYNTHIA ESTELLE, by and through her attorneys, SMITHMARCO, P.C., and for her complaint against the defendants, BLUESTEM BRANDS, INC., d/b/a FINGERHUT, LENDINGCLUB CORPORATION and WEBBANK, Plaintiff states as follows:

### I.     PRELIMINARY STATEMENT

1.     This is an action for actual and statutory damages for violations of the Fair Credit Reporting Act (hereinafter "FCRA"), 15 U.S.C. §1681, et. seq.

### II.     JURISDICTION & VENUE

2.     Jurisdiction arises under the Fair Credit Reporting Act 15 U.S.C. §1681, et. seq., and pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1337.

3.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b).

### III.     PARTIES

4.     CYNTHIA ESTELLE, (hereinafter, "Plaintiff") is an individual who was at all relevant times residing in the City of Avon, County of Hendricks, State of Indiana.

5.      At all relevant times, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. §1681a(c).

6.      BLUESTEM BRANDS, INC., d/b/a FINGERHUT (hereinafter "FINGERHUT"), is a catalog and online retailer engaged in providing financing and other financial services within the State of Indiana. FINGERHUT's principal place of business is located in the State of Minnesota, and FINGERHUT is incorporated in the State of Minnesota.

7.      At all relevant times FINGERHUT was a "person" as that term is defined by 15 U.S.C. §1681a(b).

8.      LENDINGCLUB CORPORATION (hereinafter "LENDINGCLUB") is a peer-to-peer lending company engaged in providing consumer loans and financing as well as other financial services within the State of Indiana. LENDINGCLUB's principal place of business is located in the State of California, and LENDINGCLUB is incorporated in the State of Indiana.

9.      At all relevant times LENDINGCLUB was a "person" as that term is defined by 15 U.S.C. §1681a(b).

10.      WEBBANK is an industrial bank engaged in providing consumer loans and financing as well as other financial services within the State of Indiana. WEBBANK's principal place of business is located in the State of Utah, and WEBBANK is also incorporated in the State of Utah.

11.      In partnership with FINGERHUT, WEBBANK is the national issuer of certain FINGERHUT credit accounts and installment loans, which can be used to finance purchases with FINGERHUT.

12.     In partnership with LENDINGCLUB, WEBBANK is the national issuer of unsecured personal loans, small business loans, and automobile refinance loans through the LENDINGCLUB platform.

13.     At all relevant times WEBBANK was a "person" as that term is defined by 15 U.S.C. §1681a(b).

### IV.    ALLEGATIONS COMMON TO ALL COUNTS

14.     As alleged in this pleading, "credit reports" are "consumer reports" as that term is defined by 15 U.S.C. §1681a(d).

15.     Prior to July 22, 2018, Plaintiff had an account with FINGERHUT.

16.     Upon information and belief, the account Plaintiff had with FINGERHUT was a credit account that was issued by WEBBANK.

17.     On July 22, 2018, Plaintiff filed a Chapter 7 bankruptcy petition (hereinafter, the "Bankruptcy Petition") in the United States Bankruptcy Court for the Southern District of Indiana (hereinafter, the "Bankruptcy Court"), commencing bankruptcy case number 18-05563-RLM.

18.     At the time Plaintiff filed her Bankruptcy Petition, she owed a debt to WEBBANK, as the issuer of her credit account with FINGERHUT (hereinafter, "the Debt").

19.     The Debt was for a deficiency balance that remained on Plaintiff's FINGERHUT credit account, which was issued by WEBBANK.

20.     Plaintiff scheduled the Debt in her Bankruptcy Petition.

21.     On or about October 30, 2018, the Bankruptcy Court entered an order discharging Plaintiff's debts, thereby extinguishing her liability for the Debt (hereinafter, "the Discharge Order").

22.     When the Bankruptcy Court entered the Discharge Order, the business relationship ended between Plaintiff and FINGERHUT as to the credit account.

23.     When the Bankruptcy Court entered the Discharge Order, the debtor-creditor relationship ended between Plaintiff and WEBBANK as to the Debt.

24.     Moreover, at the time of Plaintiff's discharge, there were no assets in the bankruptcy estate from which to make any distribution to Plaintiff's potential creditors.

25.     Given that Plaintiff's bankruptcy discharge resulted in a *Report of No Distribution* (i.e., Plaintiff had no assets in her estate to distribute to any creditors), any unsecured debts that were incurred prior to the filing of Plaintiff's bankruptcy petition are considered discharged, irrespective of whether the debt was specifically listed in Plaintiff's schedule of creditors, filed as part of her Bankruptcy Petition.

26.     The Debt, and any other account(s) Plaintiff had with WEBBANK, or that had been assigned to WEBBANK, and that had been incurred prior to the date Plaintiff filed her Bankruptcy Petition, were effectively discharged as of the date of the Discharge Order.

27.     On or about October 31, 2018, the Bankruptcy Court served a Certificate of Notice on FINGERHUT, which included a copy of the Discharge Order, via electronic transmission.

28.     As of October 31, 2018, FINGERHUT was effectively put on notice that any debt incurred prior to the filing of Plaintiff's Bankruptcy Petition was discharged.

29.     Upon information and belief, FINGERHUT sent a copy of the Certificate of Notice, including a copy of the Discharge Order, to WEBBANK as its partner and issuer of Plaintiff's FINGERHUT credit account.

30.     Upon information and belief, as of October 31, 2018, WEBBANK was effectively put on notice that any debt incurred prior to the filing of Plaintiff's Bankruptcy Petition was discharged.

31.     At no time since October 30, 2018 has Plaintiff opened any accounts with FINGERHUT.

32.     At no time since October 30, 2018 has Plaintiff had any personal business relationship with FINGERHUT.

33.     At no time since October 30, 2018 has Plaintiff owed any debt to WEBBANK.

34.     At no time since October 30, 2018 has Plaintiff had any personal business relationship with WEBBANK.

35.     Given the facts delineated above, at no time since October 30, 2018 has FINGERHUT had any information in its possession to suggest that Plaintiff owed a debt to WEBBANK.

36.     Given the facts delineated above, at no time since October 30, 2018 has FINGERHUT had any information in its possession to suggest that Plaintiff was responsible to pay a debt to WEBBANK.

37.     Given the facts delineated above, at no time since October 30, 2018 has WEBBANK had any information in its possession to suggest that Plaintiff owed a debt to WEBBANK.

38.     Given the facts delineated above, at no time since October 30, 2018 has WEBBANK had any information in its possession to suggest that Plaintiff was responsible to pay a debt to WEBBANK.

39.     Experian Information Solutions, Inc., (hereinafter, "Experian") is a consumer reporting agency as that term is defined by 15 U.S.C. § 1681a(f).  Experian is a data repository that assembles and stores information on consumers for the purpose of furnishing consumer reports to third parties.

40.     Trans Union, LLC (hereinafter, "Trans Union") is a consumer reporting agency as that term is defined by 15 U.S.C. § 1681a(f).  Trans Union is a data repository that assembles and stores information on consumers for the purpose of furnishing consumer reports to third parties.

41.     Consumer reports contain personal, private, and highly confidential information, including: (i) different variations of an individual's full name, including middle name and/or middle initial(s); (ii) current address at which an individual resides; (iii) previous address(es) at which an individual has resided, (iv) social security number, (v) date of birth, (vi) current telephone number, (vii) previous known telephone number(s), (viii) current employer; (ix) former employer(s); (x) public records, (xi) account histories with all reporting creditors, including, but not limited to home loans, car loans, credit cards, charge cards, and store cards; and, (xii) records of requests for a consumer report by third parties (hereinafter collectively, "Confidential Information").

42.     Given the overwhelming scope of the information available when one procures a consumer report about another, in 1970 Congress enacted the FCRA to protect consumer privacy by requiring consumer reporting agencies to, *inter alia*, limit the furnishing of consumer reports to statutorily enumerated purposes only.  See *TRW Inc., v. Andrews*, 534 U.S. 19, 23 (2001).

43.     The statute was created in response to "concerns about corporations' increasingly sophisticated use of consumers' personal information in making credit and other decisions."  *Syed v. M-I, LLC et al.,* 846 F.3d 1034, 1037 (9th Cir. 2017) (citing the FCRA, Pub.L. 91-508, Section

602, 84 Stat. 1114, 1128). *See also*, *United States v. Bormes*, 568 U.S. 6, 7 (2012) (The Fair Credit Reporting Act has as one of its purposes to "protect consumer privacy" (quotation and citation omitted)); *Cole v. U.S. Capital*, 389 F.3d 719, 723 (7th Cir. 2004) ("In [§1681] Congress made it clear that the FCRA is designed to preserve the consumer's privacy in the information maintained by consumer reporting agencies.").

44.     When it enacted the FCRA, Congress found, among other things, that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."  15 U.S.C. § 1681(a)(4).

45.     Tasked with protecting a consumer's privacy, the FCRA governs **who** can access consumer report information from credit reporting agencies and **for what purpose**.  To that end, the FCRA enumerates certain "permissible purposes" for accessing credit reports.

## COUNT I: CYNTHIA ESTELLE v. FINGERHUT, FOR VIOLATING THE FCRA, 15 U.S.C. §1681b(f)(1)

46.     Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs in this complaint as though fully set forth herein.

47.     FINGERHUT is a subscriber and user of consumer reports issued by Experian and Trans Union.

48.     FINGERHUT also furnishes data to Experian and Trans Union about its experiences with its customers and potential customers.

49.     FINGERHUT is a "furnisher" of information as contemplated by  the FCRA, 15 U.S.C. § 1681s-2(a) & (b), that regularly and in the ordinary course of its business furnishes information to one or more consumer reporting agencies about its transactions and/or other experiences with consumers.

50.     FINGERHUT has a symbiotic relationship with Experian and Trans Union such that it furnishes information to Experian and Trans Union regarding its transactions and/or other experiences with consumers while also purchasing from Experian and Trans Union information about its customers and other consumers.

51.     On or about August 28, 2019, despite being cognizant of the facts as delineated above, FINGERHUT procured from Experian a copy of Plaintiff's consumer report at which time, FINGERHUT made a general or specific certification to Experian that FINGERHUT sought the consumer report in connection with a business transaction initiated by Plaintiff, to review an account to determine whether Plaintiff continued to meet the terms of said account, or for some other permissible purpose enumerated by the FCRA.

52.     The certification made by FINGERHUT to Experian was false.

53.     Despite certifying to Experian that it had a permissible purpose for procuring Plaintiff's consumer report on August 28, 2019, FINGERHUT had no such permissible purpose.

54.     At no time on or prior to August 28, 2019 did Plaintiff consent to FINGERHUT obtaining her consumer report.

55.     On or about August 28, 2019, despite being cognizant of the facts as delineated above, FINGERHUT impermissibly procured from Experian Plaintiff's individual and personal credit report.

56.     On or about August 28, 2019, at the time FINGERHUT impermissibly procured from Experian Plaintiff's individual and personal credit report, Plaintiff's Confidential Information was published to FINGERHUT.

57.     On or about August 28, 2019, at the time FINGERHUT impermissibly procured from Experian Plaintiff's individual and personal credit report, FINGERHUT reviewed Plaintiff's Confidential Information.

58.     On or about August 28, 2019, at the time FINGERHUT impermissibly procured from Experian Plaintiff's individual and personal credit report, unknown employees, representative and/or agents of FINGERHUT viewed Plaintiff's Confidential Information.

59.     On or about August 28, 2019, at the time FINGERHUT impermissibly procured from Experian Plaintiff's individual and personal credit report, FINGERHUT obtained information relative to Plaintiff's credit history and credit worthiness.

60.     Plaintiff has a right to have her Confidential Information kept private.

61.     No individual/entity is permitted to obtain and review Plaintiff's personal and confidential information unless either Plaintiff provides her consent for the release of the information or the individual/entity has a permissible purpose to obtain the confidential information as enumerated by the FCRA.

62.     FINGERHUT procured from Experian Plaintiff's consumer report without her knowledge or consent.

63.     FINGERHUT procured from Experian Plaintiff's consumer report without a permissible purpose.

64.     By its actions, when FINGERHUT impermissibly procured from Experian Plaintiff's individual and personal credit report, FINGERHUT invaded Plaintiff's privacy.

65.     By its actions, when FINGERHUT impermissibly procured from Experian Plaintiff's individual and personal credit report, FINGERHUT effectively intruded upon the seclusion of Plaintiff's private affairs.

66.     When Plaintiff discovered that FINGERHUT had procured her personal, private and confidential information from Experian, Plaintiff was extremely angry, frustrated and suffered emotional distress resulting from FINGERHUT's invasion of her privacy.

67.     When Plaintiff discovered that FINGERHUT had procured her personal, private and confidential information from Experian, Plaintiff was extremely worried, concerned and frustrated that FINGERHUT's impermissible access of her personal, private and confidential information from one or more consumer reporting agency could continue indefinitely.

68.     When Plaintiff discovered that FINGERHUT had procured her Confidential Information from Experian, Plaintiff was concerned about the continued security and privacy of her Confidential Information.

69.     When Plaintiff received her Discharge Order from the Bankruptcy Court, she rightfully believed that her business relationship with FINGERHUT had come to an end.  When Plaintiff discovered that FINGERHUT had procured her Confidential Information after it had been sent notice of Plaintiff's bankruptcy discharge, Plaintiff believed that FINGERHUT would continue to act with impunity and continue to procure her Confidential Information indefinitely.

70.     The actions of FINGERHUT caused Plaintiff to suffer from frustration, anxiety and emotional distress that manifested itself such that: (i) Plaintiff had difficulty falling to sleep and/or staying asleep; (ii) Plaintiff had an increased appetite; and, (iii) Plaintiff suffered with headaches.

71.     On or about September 1, 2019, despite being cognizant of the facts as delineated above, FINGERHUT procured from Trans Union a copy of Plaintiff's consumer report at which time, FINGERHUT made a general or specific certification to Trans Union that FINGERHUT sought the consumer report in connection with a business transaction initiated by Plaintiff, to

review an account to determine whether Plaintiff continued to meet the terms of said account, or for some other permissible purpose enumerated by the FCRA.

72.     The certification made by FINGERHUT to Trans Union was false.

73.     Despite certifying to Trans Union that it had a permissible purpose for procuring Plaintiff's consumer report on September 1, 2019, FINGERHUT had no such permissible purpose.

74.     At no time on or prior to September 1, 2019 did Plaintiff consent to FINGERHUT obtaining her consumer report.

75.     On or about September 1, 2019, despite being cognizant of the facts as delineated above, FINGERHUT impermissibly procured from Trans Union Plaintiff's individual and personal credit report.

76.     On or about September 1, 2019, at the time FINGERHUT impermissibly procured from Trans Union Plaintiff's individual and personal credit report, Plaintiff's Confidential Information was published to FINGERHUT.

77.     On or about September 1, 2019, at the time FINGERHUT impermissibly procured from Trans Union Plaintiff's individual and personal credit report, FINGERHUT reviewed Plaintiff's Confidential Information.

78.     On or about September 1, 2019, at the time FINGERHUT impermissibly procured from Trans Union Plaintiff's individual and personal credit report, unknown employees, representative and/or agents of FINGERHUT viewed Plaintiff's Confidential Information.

79.     On or about September 1, 2019, at the time FINGERHUT impermissibly procured from Trans Union Plaintiff's individual and personal credit report, FINGERHUT obtained information relative to Plaintiff's credit history and credit worthiness.

80.     Plaintiff has a right to have her Confidential Information kept private.

81.     No individual/entity is permitted to obtain and review Plaintiff's personal and confidential information unless either Plaintiff provides her consent for the release of the information or the individual/entity has a permissible purpose to obtain the confidential information as enumerated by the FCRA.

82.     FINGERHUT procured from Trans Union Plaintiff's consumer report without her knowledge or consent.

83.     FINGERHUT procured from Trans Union Plaintiff's consumer report without a permissible purpose.

84.     By its actions, when FINGERHUT impermissibly procured from Trans Union Plaintiff's individual and personal credit report, FINGERHUT invaded Plaintiff's privacy.

85.     By its actions, when FINGERHUT impermissibly procured from Trans Union Plaintiff's individual and personal credit report, FINGERHUT effectively intruded upon the seclusion of Plaintiff's private affairs.

86.     When Plaintiff discovered that FINGERHUT had procured her personal, private and confidential information a second time, Plaintiff's emotional distress was aggravated; FINGERHUT's invasion of her privacy caused Plaintiff to become increasingly angry and frustrated.

87.     When Plaintiff discovered that FINGERHUT had procured her personal, private and confidential information a second time, Plaintiff's became increasingly frustrated, concerned, and worried that FINGERHUT's impermissible access of her personal, private and confidential information from one or more consumer reporting agency could continue indefinitely.

88.     When Plaintiff discovered that FINGERHUT had procured her Confidential Information a second time, Plaintiff was seriously concerned about the continued security and privacy of her Confidential Information.

89.     When Plaintiff received her Discharge Order from the Bankruptcy Court, she rightfully believed that her business relationship with FINGERHUT had come to an end.  When Plaintiff discovered that FINGERHUT had procured her Confidential Information for a second time after it had been sent notice of Plaintiff's bankruptcy discharge, Plaintiff believed that FINGERHUT would continue to act with impunity and continue to procure her Confidential Information indefinitely.

90.     The actions of FINGERHUT caused Plaintiff's frustration, anxiety and emotional distress become aggravated; this manifested itself such that: (i) Plaintiff had continued difficulty falling to sleep and/or staying asleep; (ii) Plaintiff had an increased appetite; and, (iv) Plaintiff suffered with headaches.

91.     WHEREFORE, Plaintiff, CYNTHIA ESTELLE, by and through her attorneys, respectfully prays for Judgment to be entered in favor of Plaintiff and against FINGERHUT as follows:

       a.     All actual compensatory damages suffered;

       b.     Statutory damages of $1,000.00 for FINGERHUT's violation of the FCRA;

       c.     Punitive damages;

       d.     Plaintiff's attorneys' fees and costs; and,

       e.     Any other relief deemed appropriate by this Honorable Court

**COUNT II: CYNTHIA ESTELLE v. LENDINGCLUB,
FOR VIOLATING THE FCRA, 15 U.S.C. §1681b(f)(1)**

92.     Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs in this complaint as though fully set forth herein.

93.     LENDINGCLUB is a subscriber and user of consumer reports issued by Trans Union.

94.     LENDINGCLUB also furnishes data to Trans Union about its experiences with its customers and potential customers.

95.     LENDINGCLUB is a "furnisher" of information as contemplated by the FCRA, 15 U.S.C. § 1681s-2(a) & (b), that regularly and in the ordinary course of its business furnishes information to one or more consumer reporting agencies about its transactions and/or other experiences with consumers.

96.     LENDINGCLUB has a symbiotic relationship with Trans Union such that it furnishes information to Trans Union regarding its transactions and/or other experiences with consumers while also purchasing from Trans Union information about its customers and other consumers.

97.     On or about April 16, 2019, despite being cognizant of the facts as delineated above, LENDINGCLUB procured from Trans Union a copy of Plaintiff's consumer report at which time, LENDINGCLUB made a general or specific certification to Trans Union that LENDINGCLUB sought the consumer report in connection with a business transaction initiated by Plaintiff, to review an account to determine whether Plaintiff continued to meet the terms of said account, or for some other permissible purpose enumerated by the FCRA.

98.     The certification made by LENDINGCLUB to Trans Union was false.

99.     Despite certifying to Trans Union that it had a permissible purpose for procuring Plaintiff's consumer report, LENDINGCLUB had no such permissible purpose.

100.    At no time on or prior to April 16, 2019 did Plaintiff consent to LENDINGCLUB obtaining her consumer report.

101.    At no time prior to April 16, 2019 did Plaintiff seek and/or apply for any lending opportunities with LENDINGCLUB.

102.    On or about April 16, 2019, despite being cognizant of the facts as delineated above, LENDINGCLUB impermissibly procured from Trans Union Plaintiff's individual and personal credit report.

103.    On or about April 16, 2019, at the time LENDINGCLUB impermissibly procured from Trans Union Plaintiff's individual and personal credit report, Plaintiff's Confidential Information was published to LENDINGCLUB.

104.    On or about April 16, 2019, at the time LENDINGCLUB impermissibly procured from Trans Union Plaintiff's individual and personal credit report, LENDINGCLUB reviewed Plaintiff's Confidential Information.

105.    On or about April 16, 2019, at the time LENDINGCLUB impermissibly procured from Trans Union Plaintiff's individual and personal credit report, unknown employees, representative and/or agents of LENDINGCLUB viewed Plaintiff's Confidential Information.

106.    On or about April 16, 2019, at the time LENDINGCLUB impermissibly procured from Trans Union Plaintiff's individual and personal credit report, LENDINGCLUB obtained information relative to Plaintiff's credit history and credit worthiness.

107.    Plaintiff has a right to have her Confidential Information kept private.

108.    No individual/entity is permitted to obtain and review Plaintiff's personal and confidential information unless either Plaintiff provides her consent for the release of the

information or the individual/entity has a permissible purpose to obtain the confidential information as enumerated by the FCRA.

109.    LENDINGCLUB procured from Trans Union Plaintiff's consumer report without her knowledge or consent.

110.    LENDINGCLUB procured from Trans Union Plaintiff's consumer report without a permissible purpose.

111.    By its actions, when LENDINGCLUB impermissibly procured from Trans Union Plaintiff's individual and personal credit report, LENDINGCLUB invaded Plaintiff's privacy.

112.    By its actions, when LENDINGCLUB impermissibly procured from Trans Union Plaintiff's individual and personal credit report, LENDINGCLUB effectively intruded upon the seclusion of Plaintiff's private affairs.

113.    When Plaintiff discovered that LENDINGCLUB had procured her personal, private and confidential information from Trans Union, Plaintiff was extremely angry, frustrated and suffered emotional distress resulting from LENDINGCLUB's invasion of her privacy.

114.    When Plaintiff discovered that LENDINGCLUB had procured her personal, private and confidential information from Trans Union, Plaintiff was extremely worried, concerned and frustrated that LENDINGCLUB's impermissible access of her personal, private and confidential information from one or more consumer reporting agency could continue indefinitely.

115.    When Plaintiff discovered that LENDINGCLUB had procured her Confidential Information from Trans Union, Plaintiff was concerned about the continued security and privacy of her Confidential Information.

116.    When Plaintiff received her Discharge Order from the Bankruptcy Court, she rightfully believed that her business relationship with LENDINGCLUB had come to an end.  When

Plaintiff discovered that LENDINGCLUB had procured her Confidential Information after it had been sent notice of Plaintiff's bankruptcy discharge, Plaintiff believed that LENDINGCLUB would continue to act with impunity and continue to procure her Confidential Information indefinitely.

117.    The actions of LENDINGCLUB caused Plaintiff to suffer from frustration, anxiety and emotional distress that manifested itself such that: (i) Plaintiff had difficulty falling to sleep and/or staying asleep; (ii) Plaintiff had an increased appetite; and, (iii) Plaintiff suffered with headaches.

118.    WHEREFORE, Plaintiff, CYNTHIA ESTELLE, by and through her attorneys, respectfully prays for Judgment to be entered in favor of Plaintiff and against LENDINGCLUB as follows:

      a.      All actual compensatory damages suffered;

      b.      Statutory damages of $1,000.00 for LENDINGLCUB's violation of the FCRA;

      c.      Punitive damages;

      d.      Plaintiff's attorneys' fees and costs; and,

      e.      Any other relief deemed appropriate by this Honorable Court.

## COUNT III: CYNTHIA ESTELLE v. WEBBANK, FOR VIOLATING THE FCRA, 15 U.S.C. §1681b(f)(1)

119.    Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs in this complaint as though fully set forth herein; pleading in the alternative, and without prejudice as to any other allegations contained herein, Plaintiff alleges the following:

120.    WEBBANK is a subscriber and user of consumer reports issued by Experian and Trans Union.

121.    WEBBANK also furnishes data to Experian and Trans Union about its experiences with its customers and potential customers.

122.    WEBBANK is a "furnisher" of information as contemplated by  the FCRA, 15 U.S.C. § 1681s-2(a) & (b), that regularly and in the ordinary course of its business furnishes information to one or more consumer reporting agencies about its transactions and/or other experiences with consumers.

123.    WEBBANK has a symbiotic relationship with Experian and Trans Union such that it furnishes information to Experian and Trans Union regarding its transactions and/or other experiences with consumers while also purchasing from Experian and Trans Union information about its customers and other consumers.

124.    On or about April 16, 2019, despite being cognizant of the facts as delineated above, WEBBANK procured from Trans Union a copy of Plaintiff's consumer report at which time, WEBBANK made a general or specific certification to Trans Union that WEBBANK sought the consumer report in connection with a business transaction initiated by Plaintiff, to review an account to determine whether Plaintiff continued to meet the terms of said account, or for some other permissible purpose enumerated by the FCRA.

125.    The certification made by WEBBANK to Trans Union was false.

126.    Despite certifying to Trans Union that it had a permissible purpose for procuring Plaintiff's consumer report, WEBBANK had no such permissible purpose.

127.    At no time on or prior to April 16, 2019 did Plaintiff consent to WEBBANK obtaining her consumer report.

128.     On or about April 16, 2019, despite being cognizant of the facts as delineated above, WEBBANK impermissibly procured from Trans Union Plaintiff's individual and personal credit report.

129.     On or about April 16, 2019, at the time WEBBANK impermissibly procured from Trans Union Plaintiff's individual and personal credit report, Plaintiff's Confidential Information was published to WEBBANK.

130.     On or about April 16, 2019, at the time WEBBANK impermissibly procured from Trans Union Plaintiff's individual and personal credit report, WEBBANK reviewed Plaintiff's Confidential Information.

131.     On or about April 16, 2019, at the time WEBBANK impermissibly procured from Trans Union Plaintiff's individual and personal credit report, unknown employees, representative and/or agents of WEBBANK viewed Plaintiff's Confidential Information.

132.     On or about April 16, 2019, at the time WEBBANK impermissibly procured from Trans Union Plaintiff's individual and personal credit report, WEBBANK obtained information relative to Plaintiff's credit history and credit worthiness.

133.     On or about August 28, 2019, despite being cognizant of the facts as delineated above, WEBBANK procured from Experian a copy of Plaintiff's consumer report at which time, WEBBANK made a general or specific certification to Experian that WEBBANK sought the consumer report in connection with a business transaction initiated by Plaintiff, to review an account to determine whether Plaintiff continued to meet the terms of said account, or for some other permissible purpose enumerated by the FCRA.

134.     The certification made by WEBBANK to Experian was false.

135.    Despite certifying to Experian that it had a permissible purpose for procuring Plaintiff's consumer report, WEBBANK had no such permissible purpose.

136.    At no time on or prior to August 28, 2019 did Plaintiff consent to WEBBANK obtaining her consumer report.

137.    On or about August 28, 2019, despite being cognizant of the facts as delineated above, WEBBANK impermissibly procured from Experian Plaintiff's individual and personal credit report.

138.    On or about August 28, 2019, at the time WEBBANK impermissibly procured from Experian Plaintiff's individual and personal credit report, Plaintiff's Confidential Information was published to WEBBANK.

139.    On or about August 28, 2019, at the time WEBBANK impermissibly procured from Experian Plaintiff's individual and personal credit report, WEBBANK reviewed Plaintiff's Confidential Information.

140.    On or about August 28, 2019, at the time WEBBANK impermissibly procured from Experian Plaintiff's individual and personal credit report, unknown employees, representative and/or agents of WEBBANK viewed Plaintiff's Confidential Information.

141.    On or about August 28, 2019, at the time WEBBANK impermissibly procured from Experian Plaintiff's individual and personal credit report, WEBBANK obtained information relative to Plaintiff's credit history and credit worthiness.

142.    On or about September 1, 2019, despite being cognizant of the facts as delineated above, WEBBANK procured from Trans Union a copy of Plaintiff's consumer report at which time, WEBBANK made a general or specific certification to Trans Union that WEBBANK sought the consumer report in connection with a business transaction initiated by Plaintiff, to review an

account to determine whether Plaintiff continued to meet the terms of said account, or for some other permissible purpose enumerated by the FCRA.

143.     The certification made by WEBBANK to Trans Union was false.

144.     Despite certifying to Trans Union that it had a permissible purpose for procuring Plaintiff's consumer report, WEBBANK had no such permissible purpose.

145.     At no time on or prior to September 1, 2019 did Plaintiff consent to WEBBANK obtaining her consumer report.

146.     On or about September 1, 2019, despite being cognizant of the facts as delineated above, WEBBANK impermissibly procured from Trans Union Plaintiff's individual and personal credit report.

147.     On or about September 1, 2019, at the time WEBBANK impermissibly procured from Trans Union Plaintiff's individual and personal credit report, Plaintiff's Confidential Information was published to WEBBANK.

148.     On or about September 1, 2019, at the time WEBBANK impermissibly procured from Trans Union Plaintiff's individual and personal credit report, WEBBANK reviewed Plaintiff's Confidential Information.

149.     On or about September 1, 2019, at the time WEBBANK impermissibly procured from Trans Union Plaintiff's individual and personal credit report, unknown employees, representative and/or agents of WEBBANK viewed Plaintiff's Confidential Information.

150.     On or about September 1, 2019, at the time WEBBANK impermissibly procured from Trans Union Plaintiff's individual and personal credit report, WEBBANK obtained information relative to Plaintiff's credit history and credit worthiness

151.     Plaintiff has a right to have her Confidential Information kept private.

152.    No individual/entity is permitted to obtain and review Plaintiff's personal and confidential information unless either Plaintiff provides her consent for the release of the information or the individual/entity has a permissible purpose to obtain the confidential information as enumerated by the FCRA.

153.    WEBBANK procured Plaintiff's consumer report from Experian and Trans Union without her knowledge or consent.

154.    WEBBANK procured Plaintiff's consumer report from Experian and Trans Union without a permissible purpose.

155.    By its actions, when WEBBANK impermissibly procured Plaintiff's individual and personal credit report from Experian and Trans Union, WEBBANK invaded Plaintiff's privacy.

156.    By its actions, when WEBBANK impermissibly procured Plaintiff's individual and personal credit report from Experian and Trans Union, WEBBANK effectively intruded upon the seclusion of Plaintiff's private affairs.

157.    When Plaintiff discovered that WEBBANK had procured her personal, private and confidential information from Experian and Trans Union, Plaintiff was extremely angry, frustrated and suffered emotional distress resulting from WEBBANK's invasion of her privacy.

158.    When Plaintiff discovered that WEBBANK had procured her personal, private and confidential information from Experian and Trans Union, Plaintiff was extremely worried, concerned and frustrated that WEBBANK's impermissible access of her personal, private and confidential information from one or more consumer reporting agency could continue indefinitely.

159.    When Plaintiff discovered that WEBBANK had procured her Confidential Information from Experian and Trans Union, Plaintiff was concerned about the continued security and privacy of her Confidential Information.

160.    When Plaintiff received her Discharge Order from the Bankruptcy Court, she rightfully believed that her business relationship with WEBBANK had come to an end.  When Plaintiff discovered that WEBBANK had procured her Confidential Information after it had been put on notice of Plaintiff's bankruptcy discharge, Plaintiff believed that WEBBANK would continue to act with impunity and continue to procure her Confidential Information indefinitely.

161.    The actions of WEBBANK caused Plaintiff to suffer from frustration, anxiety and emotional distress that manifested itself such that: (i) Plaintiff had difficulty falling to sleep and/or staying asleep; (ii) Plaintiff had an increased appetite; and, (iii) Plaintiff suffered with headaches.

162.    WHEREFORE, Plaintiff, CYNTHIA ESTELLE, by and through her attorneys, respectfully prays for Judgment to be entered in favor of Plaintiff and against WEBBANK as follows:

      a.      All actual compensatory damages suffered;

      b.      Statutory damages of $1,000.00 for WEBBANK's violation of the FCRA;

      c.      Punitive damages;

      d.      Plaintiff's attorneys' fees and costs; and,

      e.      Any other relief deemed appropriate by this Honorable Court.

## V.    JURY DEMAND

163.    Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,
**CYNTHIA ESTELLE**

By: ___s/ David M. Marco_____
Attorney for Plaintiff

Dated: September 30, 2020

David M. Marco
IL Bar No. 6273315/FL Bar No. 125266
SMITHMARCO, P.C.
55 W. Monroe Street, Suite 1200
Chicago, IL 60603
Telephone:  (312) 546-6539
Facsimile:  (888) 418-1277
E-Mail:      dmarco@smithmarco.com